IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>JAMES MORGAN,<br><br>          Defendant. | CRIMINAL ACTION<br>NO. 12-23 |

**OPINION**

**Slomsky, J.**                                                                                                  November 13, 2012

## I.    INTRODUCTION

In the fall of 2011, an adult male from Pennsylvania had sexually explicit conversations over the Internet with an undercover law enforcement agent posing as a thirteen year old girl from Texas. The Federal Bureau of Investigation ("FBI") traced the source of these communications to a home in Hatfield, Pennsylvania occupied by Defendant James Morgan. On December 20, 2011, the FBI executed a search warrant at the residence and interviewed Defendant at the nearby Costco where he was working. During the interview, he confessed to the illegal activity and gave federal agents consent to search his e-mail account. He was not advised of his Miranda rights prior to being interviewed. On January 5, 2012, despite already having received the consent to search, the FBI obtained a warrant for the e-mail account.

Presently before the Court is Defendant's Motion to Suppress the statement he gave to federal agents allegedly taken in violation of his Fifth Amendment rights. (Doc. No. 22.) He also filed a Motion to Suppress evidence seized from the search of his home and e-mail account claiming that the search warrants amount to general warrants and that the probable cause to support the search of his home was stale. (Doc. No. 23.) Moreover, to the extent the warrant for his e-mail account relied on statements he made during his interview with the agents, which he

1

contends was conducted in violation of his Miranda rights, the evidence seized from the e-mail account should be suppressed as fruit of the poisonous tree. For reasons that follow, the Court will deny Defendant's suppression motions.[1]

## II.  FACTUAL BACKGROUND

On December 20, 2011, Defendant James Morgan was arrested and charged in a Criminal Complaint with transporting twenty-three images of child pornography in interstate commerce in violation of 18 U.S.C. § 2252(a)(1), and using the Internet in an attempt to engage in sexual activity with a minor in violation of 18 U.S.C. § 2422(b).[2] (Doc. No. 1 at 1.) The following is a summary of the facts set forth in FBI Agent James Zajac's supporting affidavit to search Defendant's residence.

On September 14, 2011, an undercover employee ("UCE") working for the Somervell County Sheriff's Office in Glen Rose, Texas, logged into a Yahoo chat room posing as a thirteen year old female. (Doc. No. 23-1 at 18.) In the late afternoon, a chat conversation took place between the UCE and Yahoo user "WOOK_INKY101." (Id.) The UCE identified herself as a

---

[1]  In deciding these motions, the Court has considered the following: Defendant's Motions to Suppress (Doc. Nos. 22 and 23); Government's Response in Opposition (Doc. No. 24); and the evidence offered and arguments of counsel at the July 12, 2012 hearing (Doc. No. 39), which included the testimony of FBI Agent James Zajac and Defendant James Morgan, search warrants for Defendant's Hatfield, PA residence and Yahoo e-mail account, and the consent form to search his Yahoo e-mail account.

[2]  Defendant was subsequently indicted on January 19, 2012. The Indictment charges him with the following violations allegedly committed from September 14, 2011 through December 2, 2011:
        (1) 18 U.S.C. § 2422(b) (using interstate communications to attempt to seduce a minor – 1 count)
        (2) 18 U.S.C. § 1470 (transfer of obscene material to a minor – 4 counts)
        (3) 18 U.S.C. § 2252(a)(1) (transporting and shipping child pornography images – 4 counts)
        (4) 18 U.S.C. § 2252(a)(4) (possession of child pornography – 1 count)
(Doc. No. 8).

thirteen year old female from Glen Rose, Texas; WOOK_INKY101 said he was a dad from Pennsylvania. (Id.) After introductions, WOOK_INKY101 turned on his webcam, took off his pants, and proceeded to masturbate for thirty minutes while chatting with the UCE. (Id.) During their conversation, WOOK_INKY1001 made several sexually explicit comments. (Id. at 19.) WOOK_INKY101 also sent the UCE fifteen images that appeared to be child pornography. (Id. at 18-19.)

Over the next several months, similar conversations took place in the Yahoo chat room between WOOK_INKY101 and the UCE. WOOK_INKY101 sent the UCE six more images and two videos that appeared to be child pornography on September 16, September 19, October 3, and October 20, 2011. (Id. at 19-22.) The webcam transmissions of masturbation were repeated on September 19, October 3, and October 17, 2011. (Id. at 20-21.) WOOK_INKY101 made numerous sexually graphic comments to the UCE on September 16, September 19, October 3, October 17, October 20, November 10, November 22, and December 2, 2011. (Id. at 19-22.) Included among the many conversations were these statements from WOOK_INKY101: "so would u really like to meet in real life," "so i can take a road trip," "but you have to really be ready to learn about sex," and "would u go naked with me on cam." (Id. at 19-20.)

In an effort to identify WOOK_INKY101, a federal grand jury subpoena was issued to Yahoo. (Id. at 24.) The results showed that WOOK_INKY101 was connected to an IP address provided by Verizon. (Id.) A subpoena was then issued to Verizon, which identified the subscriber as James A. Morgan, 474 Edgewood Drive, Hatfield Boro, PA 19440. (Id.) The U.S. Postal Service confirmed that a James Morgan was currently receiving mail at the address. (Id.) Based upon this information, a federal search warrant was issued for the Hatfield residence on December 16, 2011 by U.S. Magistrate Judge Jacob P. Hart. (Id. at 1.)

The search warrant affidavit, in addition to the investigative facts noted above, contained a three page introduction: "Background Regarding Computers, The Internet, and E-Mail," which stated, among other things, the following:

> a. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. . . .
> . . . .
> b. The development of computers has added to the methods used by child pornography collectors to interact with and sexually exploit children. Computers serve four functions in connection with child pornography. These are production, communication, distribution, and storage.
> . . . .
> d. The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store hundreds of thousands of images at very high resolution.
> . . . .
> f. Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.
>
> g. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover

>evidence suggesting whether a computer contains peer to peer software, when the computer was sharing files, and some of the files which were upload or downloaded. Such information is often maintained indefinitely until overwritten by other data.

(Id. at 13-15.) The affidavit also contained four pages describing "Characteristics of Child Pornography Collector[s]," which included citations to social science publications and the observation that the "majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect their collection of illicit materials from discovery, theft, and damage." (Id. at 17.) Agent Zajac also provided extensive detail on the "Specifics of Search and Seizure of Computer Systems," the FBI's "Search Methodology To Be Employed," and its "Ability to Retrieve Deleted Files." (Id. at 25-28.) Based on all this information, Magistrate Judge Hart issued the warrant for Defendant's Hatfield residence, which authorized the seizure of numerous computer and computer-related items in the search for evidence of child pornography. (Id. at 1, 31-33.)

On December 20, 2011, the FBI executed the search warrant at 474 Edgewood Drive, Hatfield, Pennsylvania.[3] Nine FBI agents, including Agent Zajac, knocked on the door of the Hatfield house a little after 6 a.m. (Doc. No. 39 at 21, 51.) Defendant Morgan's mother, Emma Morgan, answered the door and told the agents that her son was already at work at a nearby Costco warehouse. (Id. at 22.) Agents then began a search of the residence with a brief walk-through of the entire house. (Id.) During the walk-through, Agent Zajac went into an upstairs bedroom that was similar in shape and decor to the one he had seen in the WOOK_INKY101

---

[3] At the July 12, 2012 hearing, FBI Agent Zajac and Defendant Morgan both testified about the events that occurred the morning of December 20, 2011. (Doc. No. 39 at 15-67, 68-90.) Because the Court finds Agent Zajac's testimony to be credible, the Court will use his version of events, which, for the most part, is undisputed.

5

webcam videos. (Id. at 22-23.) Not long after the search began, he left the site in an attempt to interview Defendant at Costco. (Id. at 23-24.)

Agents Zajac, Michael Dzielak, and Michael Ruibal drove to Costco in North Wales. (Id. at 24.) They told the first employee they met, "We're with the FBI. Does Jim Morgan work here? We'd like to speak with him." (Id. at 25, 39.) The agents were dressed in normal street clothes. (Id.) An assistant manager was then sent to help them. Again, Agent Zajac said "We're with the FBI. We'd like to speak to Jim Morgan, if — if — if he's here today." (Id. at 26.) Neither Costco employee was told why the FBI was interested in talking to Defendant Morgan. (Id. at 26.)

The assistant manager proceeded to lead the agents to a room near the auto shop. (Id. at 26.) The room had two unlocked doors, one in front and one in back. (Id. at 27, 30.) The agents were left alone in the room while the assistant manager went to retrieve Defendant. (Id.) Agent Zajac described his initial encounter with Defendant as follows:[4]

> Agent: Immediately, Mr. Morgan referenced, you know, "It's the FBI. It must be important if the FBI is here."
>
> AUSA: Can you describe for the Court, if you would, what his demeanor is like at this time?
>
> Agent: Relaxed. I mean, almost joking. Just very relaxed, wasn't — didn't appear to be nervous or concerned at all.
>
> AUSA: Did you introduce yourself to him?
>
> Agent: I did. As we were sitting down, again, another statement that he made before we even get into the introductions of who we are and why we're here was — he said, "I didn't travel anywhere. I didn't — I didn't travel to meet anybody."
> . . . .

---

[4] Agent Zajac testified that two other agents accompanied him to Costco to speak with Defendant; however, only one agent — Agent Dzielak — actually conducted the interview with him. (Id. at 39.) Agent Ruibal stood outside the room during the interview. (Id.)

6

> AUSA: Okay. So what happens then?
>
> Agent: He says that. We say, "Okay." We then sit down; again, myself and Agent Dzielak on the bench, Mr. Morgan across from us in a chair. I then go into the introductions, "My name is Special Agent Jim Zajac. I'm with the FBI. Special Agent Mike Dzielak here with me. I work with the FBI out of downtown Philadelphia. I'm on the cyber squad. I work computer crime, crime on the Internet, people looking at things they shouldn't be looking at, going places they shouldn't be going." I said, you know, "We just want to sit down and talk to you a little bit today to see if you can help us figure out what's going on. You don't have to talk to us if you don't want to. You can leave if you want. But we just want to ask you a few questions if that's all right with you." He didn't say anything, just agreed. And then I asked him if he knew why we were here today —
>
> . . . .
>
> AUSA: Was your weapon displayed in any way?
>
> Agent: No.
> . . . .
>
> AUSA: Okay. So — so after he sits down, then you tell him what? I'm sorry.
>
> Agent: We then ask him if he knows why we're here today.
>
> AUSA: What did he say?
>
> Agent: "No, not really."
>
> AUSA: Okay.
>
> Agent: So we then started asking him questions about computer use, any computers at his home. He stated that he has a computer at his home in his bedroom, that it's password protected. . . . He stated — he — he — gave us two email addresses that he uses, a Philliejim45@hotmail.com and Wook_inky101@yahoo.com.

(Id. at 27-31.) Defendant continued to answer questions about his computer activities, including admissions that he had sent and received what appeared to be child pornography using his

7

Wook_inky101@yahoo.com account, and had used his webcam to broadcast images of his genitals over the Internet. (Id. at 32-33.) He also confessed that "there's probably three or four files of child porn on my computer now," and, if deleted files could be recovered, "there could maybe be about 50 files on his home computer depicting child pornography." (Id. at 33.)

After Defendant Morgan had made these admissions, Agent Zajac informed him that a search of his residence was underway as they spoke. (Id. at 34.) Agent Zajac then proceeded to show him printouts of the chat logs detailing his conversations with the UCE, and also copies of the child pornography images that he had sent over the Internet. (Id. at 34-35.) Defendant admitted to participating in these conversations and to sending the images. (Id.)

Agent Zajac asked Defendant if he would be willing to consent to the FBI searching his Wook_inky101@yahoo.com account, and he agreed. (Id. at 35.) Defendant was given an FBI "Consent to Search" form, which contained the following written statements:

> 1. I have been asked by Special Agents of the Federal Bureau of Investigation to permit a complete search of:
>
>    Wook_inky101@yahoo.com [handwritten]
>
> 2. I have been advised of my right to refuse consent.
>
> 3. I give this permission voluntarily.
>
> 4. I authorize these agents to take any items which they determine may be related to their investigation.

Defendant then signed the consent form. (Id. at 35-36, Ex. 3.)

Defendant Morgan was interviewed for about two hours. (Id. at 59.) He was not given Miranda warnings at any time during the interview. (See id. at 52, 57, 66.) At no point during the interview did he ever ask to leave, nor did he tell the agents to stop the interview or ask to

8

speak with an attorney. (Id. at 41-42.) Although Defendant had a cell phone in his pocket the entire time, he never called anyone during the interview. (Id. at 42-43.) The agents did not display their weapons to Defendant, nor did they yell at him or physically harm him in any way. (Id. at 43.)

When the interview was finished, Agent Zajac stepped out of the room briefly and called the Assistant United States Attorney assigned to the case. (Id. at 39.) After informing her of Defendant's confession, they decided to arrest him on the spot. (Id.) The agents did not have any more substantive conversations with Defendant that day. (Id. at 41.)

In addition to obtaining consent to search Defendant's e-mail account, the FBI also applied for a warrant to search the account. This was done largely because "Yahoo! would be able to provide [the information] in a — a format that's more easy to read than just logging into the account." (Id. at 44.) On January 5, 2012, U.S. Magistrate Judge David R. Strawbridge issued the warrant for Wook_inky101@yahoo.com, which authorized the government to seize, among other things, evidence of child pornography and related crimes from "all content stored in or associated with e-mail account WOOK_INKY101@YAHOO.COM." (Doc. No. 23-2 at 1,17.)

Defendant moves to suppress the statement he gave to the FBI at Costco since he was not advised of his Miranda rights. He also seeks suppression of evidence from the search of his residence because the supporting warrant was an impermissible "general" warrant, and the probable cause in the affidavit was stale. He also claims that the search of his e-mail account was tainted because it was based, in part, on the use of statements obtained from him without being given the Miranda warnings. For reasons that follow, the Court will deny Defendant's suppression motions.

9

## III. STANDARD OF REVIEW

"On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005). The burden of proof is by a preponderance of the evidence. United States v. Pelullo, 173 F.3d 131, 137 (3d Cir. 1999) (citing United States v. Matlock, 415 U.S. 164, 177 n.14 (1974)).

"Where a defendant seeks to suppress a statement under Miranda, the government bears the burden of establishing by a preponderance of the evidence that the statement was not the product of custodial interrogation conducted in the absence of Miranda warnings." United States v. Kofsky, No. 06-392, 2007 WL 2480971, at *14 (E.D. Pa. Aug. 28, 2007) (citing Colorado v. Connelly, 479 U.S. 157, 168 (1986)).

## IV. ANALYSIS

### A. Defendant Was Not Subject to Custodial Interrogation by Federal Agents

Defendant James Morgan was questioned at his place of employment by two FBI agents. He was not advised of his Miranda rights before the interview took place. When the questioning was over, he was arrested. Defendant seeks to suppress his statement as taken in violation of his Fifth Amendment rights. The Court will deny the suppression motion because his statement was given during a non-custodial interrogation, which did not violate his Fifth Amendment rights.

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the Supreme Court held that the government "may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the [Fifth Amendment's] privilege against self-incrimination." The now well-established "procedural safeguards" include a warning that, among other things, the defendant has a right to remain

10

silent, any statements he makes can be used as evidence against him, and he has a right to have an attorney present with him before and during questioning. Id.

Law enforcement officers do not have to provide Miranda warnings, however, to "everyone whom they question," even when the "questioned person is one whom the police suspect." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). Rather, Miranda warnings are only required when "there has been such a restriction on a person's freedom as to render him 'in custody.'" Id. (citation omitted). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994).

In the absence of a formal arrest, the Third Circuit has directed district courts to consider the following factors when determining whether a person was "in custody" for Miranda purposes:

> (1) Whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

United States v. Willaman, 437 F.3d 354, 359-60 (3d Cir. 2006).

Courts in this district have applied the Willaman factors to situations similar to the one presented in this case. For example, in United States v. Kofsky, No. 06-392, 2007 WL 2480971 (E.D. Pa. Aug. 28, 2007), a search warrant was executed at 7:30 a.m. at the defendant's home. Id. at *9. Twenty-three federal agents were present during the five hour search, and all but three of them were armed. Id. The defendant was fully informed by the agents that the purpose of the

11

warrant was to search for evidence related to illegal distribution of drugs from his medical practice. Id. Throughout the search, the defendant moved freely around his house, but there were always agents with him wherever he went. Id. at *10. At some point, two agents, as anticipated by their search plan, asked the defendant if he was willing to speak with them. Id. He agreed, and they directed him to the kitchen. Id. The agents made clear that the defendant would not be arrested that day and he was free to leave at any time. Id. They then proceeded to question him for about two hours without ever advising him of his Miranda rights. Id. at *11, 27.

When the defendant moved to suppress the statement he gave, the court cited the Willaman factors in concluding that the interrogation was non-custodial. The court noted the following: (1) the defendant was told he was not under arrest and was free to leave at any time; (2) the interrogation took place in his kitchen, which, unlike a police station, was a non-coercive setting; (3) there was no evidence agents used hostile voices, displayed their weapons, or physically restrained the defendant; (4) the defendant voluntarily agreed to talk with them; and (5) he was actually permitted to walk throughout his home during the search. Id. at *27. Under these circumstances, federal agents were not required to provide him with any Miranda warnings prior to their interview. Id.

Similarly, in United States v. McKinney, 695 F. Supp. 2d 182 (E.D. Pa. 2010), the defendant was questioned at his office by law enforcement for about three hours during a nearly five hour search of the premises. Id. at 191. Using the Third Circuit's five-part analysis, the court concluded the defendant was not subject to custodial interrogation for the following reasons. Id. at 193. First, federal agents told him he was not under arrest and was free to leave; he was not handcuffed or physically restrained in any way. Id. at 191. Second, he was questioned in his office, a place where he both lived and worked at the time. Id. Third, his three

hour interrogation, while admittedly long, was still within an acceptable range of time for non-custodial interrogations. Id. Fourth, agents did not use hostile tones of voice, display weapons, or physically restrain the defendant, although, as in Kofsky, an agent was present with the defendant throughout the entire search. Id. at 191-92. Finally, he voluntarily submitted to the questioning. Id. at 192. Based on these factors, federal agents were not required to provide Miranda warnings to the defendant before they questioned him. See id. at 193.

Here, when the Willaman factors are applied to Defendant Morgan's questioning, the Court is led to the same conclusion as Kofsky and McKinney. First, Defendant was not under arrest when he was interviewed by Agent Zajac and his partner. They did not plan to arrest him when they first started the interview. Agent Zajac explicitly told Defendant that he did not have to talk to them and was free to leave.

Second, he was interviewed at his place of employment, not a coercive setting like an FBI office. Additionally, the agents did not tell his supervisors of the purpose for their visit. Thus, there was no indication that anyone in Costco even knew he was the potential subject of a federal investigation.

Third, the interview lasted about two hours, the same amount of time as in Kofsky and even less time than the three hour interview in McKinney.

Fourth, there is no evidence the agents used a hostile tone of voice. They did not display weapons or physically restrain him in any way. Moreover, there were two agents present during the interview, unlike in Kofsky and McKinney where the defendants' houses were swarming with agents while the interview occurred.

Finally, Defendant Morgan voluntarily submitted to the agents' questioning. He began by blurting out that he had never traveled to meet anyone, suggesting at least some awareness of

13

possible wrongdoing. Agent Zajac then said he worked on the cyber squad investigating computer crimes. Defendant was told he did not have to talk with them. He proceeded to answer a variety of questions about his computer activities without ever asking to leave, use the phone, walk around, or speak with an attorney. Under these circumstances, there was no requirement that the agents give Defendant his <u>Miranda</u> warnings.[5] Thus, Defendant Morgan's statements were not obtained in violation of his Fifth Amendment right against self-incrimination.[6]

### B. Search Warrant for Residence Was Not A General Warrant

On December 16, 2011, U.S. Magistrate Judge Jacob P. Hart issued a search warrant for Defendant Morgan's residence in Hatfield, Pennsylvania. The warrant authorized federal agents to seize all computer and computer-related items within the residence while searching for

---

[5] At the July 12, 2012 hearing, Defense Counsel also raised for the first time the argument that Defendant did not voluntarily consent to the search of his Yahoo e-mail account at the end of his December 20th interview. The Court disagrees.

A court must "determine the voluntariness of a consent by examining the totality of the circumstances." <u>United States v. Price</u>, 558 F.3d 270, 278 (3d Cir. 2009). This determination is a finding of fact made by the court. <u>Id.</u> at 278 n.7. "Both 'the characteristics of the accused and the details of the interrogation' are useful to determine whether, under all the circumstances, a consent to search was voluntary, and no case should 'turn[ ] on the presence or absence of a single controlling criterion.' Factors to consider include: the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment. . . . [as well as] 'the setting in which the consent was obtained [and] the parties' verbal and non-verbal actions.'" <u>Id.</u> (citations omitted).

Here, the same facts recited above showing that a non-custodial interrogation took place, also support a finding of voluntary consent. Without any evidence of hostility or intimidation, Agent Zajac provided Defendant with an FBI Consent to Search Form, which clearly informed Defendant what he was consenting to and his right to refuse consent. Defendant then signed the form. Based on these facts, Defendant's consent to search his Wook_inky101@yahoo.com account was given voluntarily.

[6] Because the Court finds Defendant's statements were not taken in violation of his Fifth Amendment rights, Defendant's fruit of the poisonous tree argument directed at the search warrant for his Yahoo e-mail account also fails. No statements used in the search warrant affidavit were tainted by a Fifth Amendment violation.

14

evidence of child pornography and similar crimes. Defendant contends the search warrant for electronic data constituted an impermissible "general" warrant in violation of his Fourth Amendment rights.[7] For reasons that follow, the Court finds this contention unavailing.

The Fourth Amendment establishes the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by requiring, among other things, a search warrant to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment's particularity requirement "'makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'" Andersen v. Maryland, 427 U.S. 463, 480 (1976) (quoting Stanford v. Texas, 379 U.S. 476, 485 (1965)). The particularity requirement is violated when a warrant describes the places to be searched and/or items to be seized in such general terms that it "vest[s] the executing officers with unbridled discretion to conduct an exploratory rummaging through [a defendant's] papers in search of criminal evidence." United States v. Christine, 687 F.2d 749, 753 (3d Cir. 1982). Evidence obtained from a general search warrant must be suppressed. Id. at 758.

"[E]xamples of general warrants are those authorizing searches for and seizures of such vague categories of items as 'smuggled goods,' 'obscene materials,' 'books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas,' 'illegally obtained films,' and 'stolen property.' United States v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents, 307 F.3d 137,

---

[7] Additionally, Defendant argues that the search warrant for his e-mail account was an impermissible general warrant. The search warrant application for the e-mail account is nearly identical to the application for the search of his residence. Thus, the following discussion also applies to the January 5, 2012 search warrant issued for his Yahoo e-mail account.

15

149 (3d Cir. 2002) (citation omitted). However, the "Fourth Amendment does not prohibit searches for long lists of documents or other items provided that *there is probable cause for each item on the list* and that *each item is particularly described*." Id. at 148 (emphasis added).

In this case, the search warrant for the Hatfield residence authorized the government to seize the computer hardware and software located in the residence as part of the search for evidence of criminal conduct. Such seizures were justified under the warrant because electronic evidence is the heart of this case.

The search warrant application provided extensive detail on the computer activity of Wook_inky101@yahoo.com from September through December 2011. This Yahoo account was used to engage in sexually explicit conversations, send sexually graphic images, and transmit child pornography to a person believed to be a thirteen-year-old girl in Texas. Federal agents traced this activity to Defendant's residence. The search warrant application noted the importance of computer technology in creating, exchanging, and storing child pornography, and also explained how agents would conduct their electronic searches of any evidence seized from the residence. The application made clear that evidence of child pornography rarely, if ever, completely disappears from any computer that once housed it.

In sum, the warrant authorized the FBI to seize a wide array of electronic equipment and data to search for evidence of criminal activity that was thoroughly supported by the general characteristics of those involved in child pornography, and by the actual facts in this case. The Court therefore concludes that the search warrant for the Hatfield residence was not a general warrant and properly complied with Fourth Amendment requirements.[8]

---

[8] Defendant also argues evidence seized from his Yahoo e-mail account — which dates back to 2009 — exceeded the scope of the warrant and therefore should be suppressed. The

## C. Probable Cause for Search Warrant for Defendant's Residence Was Not Stale

The search warrant for Defendant's residence was issued on December 16, 2011. The last alleged involvement in criminal activity occurred on December 2, 2011. Defendant argues that this fourteen day hiatus renders the government's probable cause stale. The Court is not persuaded by the argument.

The Third Circuit set forth the following guidelines for analyzing a staleness claim:

> Age of the information supporting a warrant application is a factor in determining probable cause. If too old, the information is stale, and probable cause may no longer exist. *Age alone, however, does not determine staleness*. "The determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of the warrant." Rather, we must also *examine the nature of the crime and the type of evidence*.

United States v. Harvey, 2 F.3d 1318, 1322 (3d Cir. 1993) (internal citations omitted) (emphasis added).

In Harvey, the government obtained a search warrant for the defendant's residence. Id. at 1321. In support of the warrant, the affidavit provided that the defendant was a pedophile who had received thirteen mailings from organizations known or suspected of distributing child pornography. Id. at 1323. Ten of those mailings had occurred at least thirteen months before the warrant was issued; the final three were received two months prior to the warrant. Id. Relying on the testimony of a federal agent, the Third Circuit held the information in the warrant application was *not* stale because "'pedophiles rarely, if ever, dispose of sexually explicit material." Id. Thus, "there was a reasonable probability the several mailings from child pornographers would be at [the defendant's] residence at the time of the search. Id.; see also

---

Court disagrees because the probable cause in the search warrant affidavit amply demonstrated that the images were in all likelihood still in the computer at the time of the search.

17

United States v. Vosburgh, 602 F.3d 512, 528 (3d Cir. 2010) (holding four month gap did not render probable cause stale because "as we have long recognized, persons with an interest in child pornography tend to hoard their materials and retain them for a long time").

Here, the time lapse was only two weeks between the last act and the issuance of the search warrant. Such a time period does not render the probable cause stale, especially considering the nature and duration of the interaction between Wook_inky101@yahoo.com and a thirteen-year-old girl. The Yahoo e-mail account was used to carry out the alleged crimes over a period of several months. The government's search warrant application set forth extensive facts which established that these particular types of crimes are ones in which evidence can be found on a computer that was stored for months, if not years. Thus, there was a "reasonable probability" that evidence of Wook_inky101@yahoo.com's crimes would be found on the computer in Defendant's residence even after the fourteen day hiatus between the criminal conduct and the issuance of the search warrant. The probable cause was not stale.

V.  **CONCLUSION**

For the foregoing reasons, the Court will deny Defendant's Motion to Suppress Statement (Doc. No. 22) and Motion to Suppress Fruits of Search Warrant (Doc. No. 23). An appropriate Order follows.